In re NASSAU.

(District Court, E. D. Pennsylvania. October 12, 1905.)

No. 2,118.

1. BANKRUPTCY—VOIDABLE PREFERENCES—REASON TO BELIEVE DEBTOR INSOLVENT.

Where the agent of a creditor, when taking mortgages to secure the indebtedness to his principal within four months prior to the debtor's bankruptcy, had knowledge of facts which should have put him on inquiry as to the debtor's solvency, he and his principal are legally chargeable with knowledge of such facts as the inquiry would have disclosed.

[Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Bankruptcy, § 258.]

2. SAME—EVIDENCE.

Evidence considered, and *held* to show that a bankrupt was insolvent at the time of giving mortgages to secure a prior indebtedness within four months prior to his bankruptcy, and that the agent who acted for the mortgagee in taking the security had reasonable cause to believe him insolvent, and that a preference was intended, which rendered the mortgages voidable by the bankrupt's trustee.

In Bankruptcy. On certificate from referee.

The following is the opinion of Richard S. Hunter, referee, on petition of trustee to vacate mortgages and answer of mortgagee:

A petition of Louis C. Gillespie and other creditors of James Nassau was presented to the court on the 8th day of December, 1904, alleging, inter alia, that the said James Nassau was insolvent and had within four months committed an act of bankruptcy, in that he did on or about November 18, 1904, execute and deliver to Annie M. Phillips two mortgages of his real estate situate' at Kensington and Erie avenues, and Harrowgate and Nicetown Lanes, with intent to prefer the said Annie M. Phillips over his other creditors.

On the same day Nassau signed and delivered to the petitioning creditors a writing which was attached to the said petition, wherein he stated that he was unable to pay his debts, and was willing to be adjudged a bankrupt on that ground. On December 12, 1904, Nassau was adjudged a bankrupt. The case was referred, and at a meeting before the referee on January 10, 1905, Augustus J. Loos was unanimously elected trustee, and was authorized to continue the business of the bankrupt, to wit, the manufacture of varnish at Kensington and Erie avenues on real estate covered by the mortgages.

On November 17, 1904, Nassau executed and delivered to Annie M. Phillips two mortgages, one of them to secure the payment of $6,800, and the other to secure the payment of $10,000, in six months from their date, with interest at 6 per cent. per annum. The mortgages were duly recorded; the smaller a day before the larger. Both of them described and were secured upon all the real estate of Nassau, being a vacant lot of ground in the tenth survey district, situate at Harrowgate and Nicetown Lanes, and a lot of ground in the thirty-third ward of the city of Philadelphia, situate at Kensington and Erie avenues, with the buildings and improvements thereon erected, together with the plant, apparatus, fixtures, and appurtenances used in the late business pertaining to the manufacture of varnish, for which the improvements were constructed.

On the 6th of February, 1905, the trustee, through his counsel, filed his petition before the referee, setting forth the above facts; setting forth, also, that Nassau was insolvent at the time of the transfer, that the consideration for the execution of the mortgages was an antecedent indebtedness of six years' standing to 'Annie M. Phillips, secured only by promissory notes, and that the effect of the enforcement of the said transfer would be to sweep away the most valuable asset of the bankrupt, and to enable Annie M. Phillips to obtain a greater percentage of her debt than any other creditor of the

same class; and averring that such transfer was in effect a preference in favor of Annie M. Phillips, and that at the time she received the said preference she, or her agent, Thomas M. Longcope, had reasonable cause to believe that it was intended thereby to give a preference. The petitioner further averred that the mortgages in question were incumbrances made within four months prior to the filing of the creditors' petition, with intent and purpose to hinder and delay creditors. The petitioner prayed that an order be made on Annie M. Phillips why the mortgages should not be vacated and set aside.

To this petition an answer was filed on February 16, 1905, by Annie M. Phillips, admitting the execution and delivery of the mortgages, and averring that the indebtedness had previously been secured by promissory notes, and a bond of James Nassau given for actual cash loaned to him; that at the time of the execution and delivery of the said mortgages neither she nor her agent, Thomas M. Longcope, had any knowledge of the insolvency of the said James Nassau, or any reason to believe that he was insolvent, or that the mortgages were given with intent to prefer.

On Thursday, February 16, 1905, and upon various subsequent dates, evidence was taken at the office of the referee in support of the petition and the answer. The witnesses examined were Annie M. Phillips; Thomas M. Longcope, her agent; Albert H. Lupton, Nassau's bookkeeper; James Nassau, the bankrupt, and William A. Gretzinger, a real estate broker, called by the trustee.

From this testimony the referee finds the following facts:

The indebtedness for which the mortgages were given was of long standing. Ten thousand dollars was lent in 1886, and the loan was renewed in 1892. Two thousand dollars more was lent in 1895; $3,000 in 1896; and $1,500 in 1898—making, with $300 of interest, a total of $16,800 of indebtedness. The relationship between Mrs. Phillips and Nassau was one of entire trust and confidence on her part, and it does not appear that she at any time was aware of his approaching insolvency. She did, however, become anxious to put the debt into better shape as far back as 1897, and made suggestions from time to time for better security. In the spring of 1904 Nassau agreed to give her a mortgage, but for reasons which do not very clearly appear, but which are stated to have been on account of Mrs. Phillips's illness and absence from the city, the mortgages were not executed until November 17, 1904. Three weeks thereafter Nassau confessed his insolvency and was adjudicated a bankrupt.

Two questions of facts arise in the case: (1) Was Nassau a bankrupt at the time of the execution of these mortgages? (2) Had Mrs. Phillips, or her agent, reasonable cause to believe that the mortgages were intended as preferences?

1. As to the insolvency of the bankrupt on November 17, 1904, the bankrupt's assets on October 31, 1904, when a trial balance was taken, were stated by the bookkeeper as follows:

| | |
|---|---:|
| Cash | $ 37 24 |
| Outstanding accounts | 9,717 77 |
| Factory, plant, and real estate | 16,042 36 |
| Fixtures and implements | 2,267 96 |
| Bills receivable | 70 62 |
| Two shares of Philadelphia bourse stock | 150 00 |
| Due from salesmen | 79 98 |
| Value of stock on hand | 4,000 00 |
| | $32,365 93 |

The liabilities according to the books were at that time $31,467.85. This would apparently show an excess of assets at that time of $898.08. A certain lot belonging to Nassau, and mortgaged for $1,500, was not included in this statement of assets. The value of this lot was estimated at widely varying figures; by the trustee at $1,700 above the mortgage; by Mrs. Phillips at $4,500 above the mortgage.

On the other side, Nassau had borrowed from insurance companies on policies belonging to his wife $3,070, and on policies belonging to his daughter

$1,520, making his total indebtedness $36,057.10. Should we accept the trustee's valuation of the equity in the vacant lot, the liabilities would exceed the assets by about $2,000. If, on the other hand, we accepted the estimate of Mrs. Phillips, the assets would exceed the liabilities about $700.

This is, of course, upon the supposition that the values of the real estate entered in the trial balance are correct. The correctness of this valuation is questioned by the trustee, who called William A. Gretzinger, a real estate broker, doing business at 2025 East Dauphin street, and asked him what value he placed upon the property of Nassau at Kensington and Erie avenues. He appraised the buildings at $4,000 and the ground at $8,500, making a total of $12,500. The lot at Harrowgate and Nicetown Lanes he appraised at $2,500, at the rate of $1,000 per acre. He testified that the property at Kensington and Erie avenues was assessed for taxation prior to 1904 at $7,500, and in 1904 it was raised to $9,500, which is the present assessment. This witness was cross-examined at length by Mr. Gilpin, counsel for the mortgagee. The witness figured the lot at 21,000 square feet, and apparently reached his estimate of $8,500 by valuing it as forty cents a square foot. Being asked, "Tell us some other lot that you have derived your knowledge of values," he answered: "The properties I have reference to are located in Frankford; ground similar to this being filled in with ashes, as all of this ground mostly is, all fixed on a basis of forty cents a square foot." These lots were four or five squares from the railway, and not on a main thoroughfare. The Nassau lot is on Kensington and Erie avenues, and close to the railway, but the witness testified that this latter circumstance was a positive disadvantage, "an eyesore, and a nuisance of a railroad coming across," the railroad being of no use to a manufacturing plant on account of the want of proper facilities. As to the buildings, he testified that they could be replaced for from $4,000 to $5,000, but had not a very close recollection of the buildings. He remembered, however, that they were brick, and about nine inches thick. He testified to a sale in the neighborhood of a piece of ground of 3,138 square feet to the railroad company for $500.

The witness was also cross-examined concerning his valuation of the lot at Harrowgate and Nicetown Lanes at $1,000 an acre, in comparison with another lot on Erie and Tulip street, which he valued at $4,000 an acre. This he explained by testifying that the more expensive lot had facilities for a railroad siding and was on grade, and that both the streets were opened.

Mr. Longcope, called in rebuttal by the mortgagee, testified as to the vacant lot of 2½ acres, that it would cut up, irrespective of the street on the city plan, into 93 lots of 15 feet by 50 or 60 feet deep, which, at $150 a lot, would be $14,950. If the city plan was taken into account, 60 lots could be carved out of the property, which, at $150 a lot, would be $9,000, and, at $100 a lot, $6,000. Mr. Longcope had never seen the property, and knew of no sales in the neighborhood.

The bankrupt, also called in rebuttal of Mr. Gretzinger's testimony as to the value of the lot and improvements on Kensington and Erie avenues, stated that they cost, in 1890, $19,500; that they were made of hard brick, and were almost as good for the purposes of a varnish factory as when they were put up.

The referee, while unable entirely to adopt either set of figures, is decidedly of the opinion that the real estate at Kensington and Erie avenues was carried on the bankrupt's books at a price far in advance of its real value. No allowance was made for the deterioration of a factory building, or for the fact that a building erected for a special purpose has little value in the general market. The assessment of 1904, made at a time when, with the object of securing increased revenue to the city, the values of property were taken, or intended to be taken, at their full selling price, is material. The assessment for the lot and buildings constituting the varnish factory was $9,500. It is carried on Nassau's books (including the $7,000 mortgage) at $23,000. The referee values it, under the evidence given at $15,000.

The testimony with regard to the vacant lot is not very satisfactory. Gretzinger estimated it at $1,000 an acre "practically from ground in other sections similar bringing $1,000," and explained that these sections were "Southwest section, West Philadelphia section, and Northeast section, the ground

located in a similar neighborhood." Longcope, on the other hand, fixes a value from the way in which the property would cut up into small lots, without showing any demand for such lots or a possibility of selling them.

The referee values the lot at $1,500 an acre, being for the 2½ acres $3,750, subject to an incumbrance of $1,500, and values the equity of the bankrupt at $2,250.

The assets of the bankrupt on October 31, 1904, should therefore be stated as follows:

| | |
|---|---:|
| Cash | $ 37 24 |
| Outstanding accounts | 9,717 77 |
| Factory and plant (equity on mortgage of $7,000) | 8,000 00 |
| Fixtures and improvements | 2,267 96 |
| Bills receivable | 70 62 |
| Phila. bourse stock (two shares) | 10 00 |
| Due from salesmen | 79 98 |
| Estimated value of stock | 4,000 00 |
| Equity in vacant lot | 2,250 00 |
| | $26,433 57 |

And the liabilities as follows:

| | |
|---|---:|
| As per books | $31,467 85 |
| On insurance policies | 4,590 90 |
| | $36,058 75 |

Showing an excess of liabilities over assets of $9,625.28.

No evidence was given before the referee to indicate that any change for the better occurred in the bankrupt's financial condition between October 31, 1904, and November 17, 1904, when the mortgages were given. At or about the time of the making of these mortgages, his estate was further diminished by the collection of accounts due, amounting to $1,785, by his son, and on the 8th day of December, 1904, he acknowledged himself insolvent, as a preliminary to the proceedings in bankruptcy.

The referee finds that Nassau was insolvent at the time of the execution of the mortgages to Mrs. Phillips.

2. The question remains whether Mrs. Phillips, or her agent, had reasonable cause to believe that he was insolvent at the time when the mortgages were given.

The relation between Mrs. Phillips and the bankrupt was one of confidence and regard. They were first cousins, and, as she says, "more like brother and sister." She advanced him from time to time considerable sums of money, with no further security than his own notes and bond. She stated before the referee that she would never under any circumstances have put him into bankruptcy, and there was an understanding between them as to the ultimate disposition of part of the moneys lent, which will be hereafter adverted to. Nevertheless, as time went on, she desired a business-like security for her advances, and suggested it as far back as 1897. Apparently, however, she did not insist upon it, as nothing was done to secure her until the spring of 1904, when Nassau promised to give her second mortgages upon his real estate. There was a delay in fulfilling this promise. The matter was again taken up through Mr. Longcope, her agent, in the fall of 1904, and on November 17, 1904, the mortgages were executed. At that time, as the referee has found, Nassau was insolvent, and within three weeks thereafter declared himself to be so, for the purpose of taking advantage of the act of 1898. Mortgages given under such circumstances are most carefully to be scrutinized.

Mrs. Phillips declared on the stand that neither then nor at any previous time did she suspect insolvency or approaching bankruptcy. Nassau had always punctually paid the interest on his obligations. It is quite evident, however, that she felt the necessity of further security, either for herself, or, as she states it, for her daughter after her death, and her desire to obtain it seems to have been partly caused by her interest in the welfare of Nassau. She intended, as Mr. Longcope testified, that $10,000 of his indebtedness to her should either be gradually liquidated, or, in case of her death, should be

bequeathed by her to Nassau in her will. For this reason the indebtedness was divided into two mortgages—one of $6,800, and one of $10,000—and the $10,000 mortgage was recorded on the day subsequent to the $6,800 mortgage, in order that the smaller mortgage might have a prior lien.

Mrs. Phillips' precise knowledge, or means of knowledge, as to the condition of the bankrupt, is less material than that of her agent, Mr. Longcope, who took charge for her of the obtaining of the mortgages, and with whom the actual dealings took place. Nassau was represented by J. B. Uhle, Esq., a member of the Bar. When Mr. Longcope asked for the mortgages, the bankrupt said that he would give them, but asked that the period of two months, for which they were originally drawn, should be extended to six months. This was accordingly done, and the mortgages were sent to Mr. Uhle's office. Mr. Uhle told the bankrupt that he was very doubtful about the mortgages, if Nassau went into bankruptcy within four months. When the mortgages had been prepared and executed, Longcope went over to Uhle's office to ask him to fill in the date of the bonds. Mr. Longcope testifies: "Mr. Uhle then said, 'Mr. Longcope, you realize in case of bankruptcy these mortgages would not take precedence?' I said, 'Mr. Uhle, you are raising a question that has never occurred to me. Is there any reason to think that Mr. Nassau is going into bankruptcy?' He said, 'No.' I turned to Mr. Nassau and asked him if there was any reason for Mr. Uhle mentioning the question of bankruptcy. He said, 'Not so far as I am concerned.'" This testimony is confirmed by the bankrupt, who says, "He [Mr. Longcope] said he hoped I did not entertain such a thought as going into bankruptcy, and I said I certainly did not."

Mr. Longcope made no further inquiries as to Nassau's financial condition, made no examination of the properties covered by the mortgages, took no title policy, but did take searches. The mortgages were at once recorded. The bonds were not delivered until some 10 days later, after the searches had been procured.

Mr. Longcope was asked the question, "Did he [Nassau] say he had any contemplation of going into bankruptcy?" He answered: "I cannot say. As near as I can remember, he put it in the same language as 'I am solvent.' He left me with that absolute impression, and I was wondering why Mr. Uhle had used the word 'insolvent.' When Mr. Uhle handed me the mortgages, he said, 'If Mr. Nassau went into bankruptcy these mortgages would not take precedence.'" This conversation occurred after the execution of the mortgages, but before they were recorded.

The referee can feel no doubt as to the legal conclusion to be drawn from these facts. A creditor who has no security for cash advances to the debtor, which would give her any preference over other creditors in case of his bankruptcy, asks for and obtains mortgages, giving a lien on the valuable and material asset of the debtor. She herself has no knowledge of his financial condition, and asks for these mortgages, partly from natural business caution and partly from a desire to benefit the debtor, who is her near relative, like a brother to her, and to whom she intends to bequeath the larger part of his indebtedness. Her agent, immediately upon taking the mortgages, and before they are recorded, is warned by the debtor's counsel that in case of bankruptcy these mortgages would give the creditor no priority. He asks the debtor whether he intentds or expects to go into bankruptcy and is answered, "No: not so far as I am concerned." He makes no further inquiries, records the mortgages in such order of priority as will effectuate his client's intention to make one of them an ultimate gift to the debtor, makes no examination of the property, and, when the searches show an assessment of less than one-half the value of the real estate stated to him by the debtor, contents himself by an inquiry of the debtor as to its correctness. The inference is irresistible that he judged it better to make no further inquiry. Had he made this inquiry he would, as an experienced man of business, have ascertained the facts rehearsed in this opinion, and must have come to the conclusion that Nassau was insolvent, and that these mortgages constituted a preference over other creditors.

The law which governs this state of facts need not be dwelt upon. The knowledge of the agent is the knowledge of the principal, and she is affected

with notice of all facts which would on inquiry have been brought to his attention. It is true that these facts must be such as to raise, not merely a suspicion, but a belief of insolvency. But, can it be doubted that this belief would inevitably have followed?

The referee finds that the mortgagee had reasonable cause to believe that the bankrupt was insolvent at the time the mortgages were given.

\* \* \* \* \* \* \*

Referee Hunter's opinion on exceptions to the finding of the referee is as follows:

Upon argument of these exceptions, especial stress was laid upon the finding of the referee that $4,590 was due from the bankrupt to his wife and daughter on the insurance policies of which they are the beneficiaries. Two of these policies are so expressed that if the wife or daughter, respectively, shall be living at the time when the policy shall become payable, the amount is to be paid to the wife or daughter; but, if they die before such time, it shall then be payable to the insured. The third is payable to him, if he survives the fixed period; otherwise to his wife. Loans were made by the insurance companies on these policies on the joint note of Nassau and his wife in two instances, and of Nassau and his daughter in the other instance, leaving a very small balance to the credit of the policy. The wife and daughter proved for the amount of these loans, and the referee debited Nassau with the amount of the loan in his finding. Mr. Gilpin for the claimant now argues that, as the interest of the wife and of the daughter in these policies is a contingent one, the loan made to Nassau by the insurance companies on these joint notes should not be considered as an indebtedness due by him.

The situation is a peculiar one. The nominal creditors, the insurance companies, are secured by the pledge of the policies, and have made no claim before the referee. Their loans were in effect an anticipation of moneys to become due by them, either to the beneficiaries or the insured. The money was used by Nassau in his business, and, in the event of his death before the beneficiaries, the amounts payable to them on these policies will be reduced by the amount of the loan.

Under the recent cases any insurance policy in which the bankrupt has an interest of present value passes to his trustee without regard to the surrender value fixed upon it by the insurance company. It cannot be said that there is no present value to Nassau, and hence to his creditors, in these policies. This is certainly the case with the policy in the John Hancock Company, which is an endowment policy payable to him if he survive the fixed period. It must be admitted that Nassau's estate has a contingent interest, which will pass to the trustee. It is also evident that the rights of the trustee can rise no higher than that of the bankrupt, and that the wife's and daughter's claim to receive the proceeds of the policies, in case they are living when these policies mature, are in no wise affected by the bankruptcy.

No case has been cited to the referee, or has been discovered by him, exactly analogous to the present. A contingent debt may doubtless be proved against the estate, and a sum retained by the trustee to meet the contingency. It does not follow, however, that this contingent debt is to be assessed as a present liability and cause the debtor's liabilities to outweigh his assets. The bankrupt appears entitled to the benefit of the doubt whether this contingent liability will mature into an actual one.

The referee amends his finding that Nassau was insolvent, at the time of giving the mortgages to Mrs. Phillips, in the amount of $9,624.28, by deducting from the said sum the amount of $4,590 borrowed on the policies of insurance, and finds that Nassau was then insolvent in the sum of $5,034.28.

The referee sees no reason to alter in any other respect his findings of fact or law.

Harry S. Hopper and Walter C. Rodman, for trustee.
Bernard Gilpin, for mortgagee.

J. B. McPHERSON, District Judge. The two questions involved in this controversy are questions of fact, and the referee's conclusions thereon are not to be disturbed, except for plain mistake. Such mistake I do not find, after a careful examination of the testimony, although there may be room for a fair difference of opinion concerning the bankrupt's solvency at the time when the mortgages were given. Upon the second question, I have no difficulty in agreeing with the referee that the circumstances accompanying the transaction were such as to put the mortgagee's agent upon inquiry, and it can scarcely be doubted that very slight investigation would have led to knowledge of the bankrupt's financial condition.

The referee's order vacating the mortgages is therefore affirmed.